# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CRUZ AYALA and DUSTIN AYALA,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | **No. 3:08-cv-01100** |
| **v.** | ) | **Judge Nixon** |
| | ) | **Magistrate Judge Bryant** |
| **SUMMIT CONSTRUCTORS, INC.,** | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>ORDER</u>

This is an action brought by Plaintiffs Cruz Ayala and Dustin Ayala (individually, "Cruz" or "Dustin," and collectively, "the Ayalas") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* [hereinafter *Title VII*] and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101, *et seq.,* against their former employer, Defendant Summit Constructors, Inc. ("Summit"). A bench trial was held from March 2 to March 4, 2010. The parties filed their proposed findings of fact and conclusions of law on May 24, 2010. (Doc. Nos. 53 & 54.) For the reasons stated below, the Plaintiffs have failed to meet their burden of persuasion as to their hostile work environment claims and Dustin's retaliation claim, and the Court **ENTERS JUDGMENT** in favor of Summit on these claims; however, the Court finds that Plaintiffs have met their burden as to Cruz's retaliation claim, and so the Court **ENTERS JUDGMENT** in Plaintiffs' favor on this claim.

## I. FINDINGS OF FACT

Cruz and Dustin Ayala, a father and son, are former employees of Summit Constructors, Inc. They worked within the company's blasting department—one of Summit's four areas of work. Cruz Ayala immigrated to the United States from Mexico in 1989, and he and his wife

(who is white) had Dustin while living in the United States. Cruz is lawfully present in this country, and Dustin is an American citizen who considers himself to be half-Mexican and half-white. Cruz attended school through the second grade in Mexico, and is minimally literate in Spanish and illiterate in English. He does not have a strong command of spoken English. He has performed a range of work in the United States, including farming when he first arrived here, framing houses, cleaning at a Nissan plant, factory work, and asbestos removal. Dustin attended school through the eighth grade and thereafter worked in fast food restaurants, followed by work in the construction industry in his late teenage years.

Cruz began to work at Summit Constructors as a laborer—the lowest-skilled type of work on Summit's blasting crews, which included assignments such as pouring gravel, hauling items, and other menial tasks—on January 20, 2006. He started working on a blasting crew led by Dwayne Carr and then moved to a crew led by David Nabors. While working for Nabors, Cruz sought employment for Dustin at Summit, too. Dustin began working as a laborer with Carr's crew on September 16, 2006 at a pay rate of $12.50 per hour and was later moved to Stoney Roberts' crew with his father.

At the time of their hiring, both men were provided copies of the company's Employee Handbook, which contains a Non-Discrimination and Harassment Policy, as well as complaint procedures. Cruz could not read the Employee Handbook, and he did not ask his literate wife or son to read it to him; Dustin did not read the Employee Handbook, either.

Cruz alleged at trial that he began to experience harassment from Nabors while working on his crew, and then later while working on Roberts' crew with Dustin. He claimed that he was subjected to derogatory comments about his heritage and slurs such as "wetback" or "fucking Mexican." Initially, he claimed at trial that he heard these terms three or four times per day, five

or six times per week. When pressed on the frequency of this language on cross-examination, he conceded that he had indicated in a previous deposition that the terms were used only a "few" or "couple of" times. It is undisputed that Cruz performed well throughout his tenure at Summit, and he testified that he "never fuss[ed]" about the alleged harassment and "always ke[pt] [his] ears closed" because he was making good money. Dustin also testified that Roberts used derogatory language regarding Mexicans toward him, indicating that this occurred almost daily, sometimes multiple times within one day.

Brian Settles, a co-worker and friend of the Ayalas at Summit who rented a trailer from Cruz, testified that he heard Nabors using Hispanic slurs behind the Ayalas' backs; however, he never worked on Nabors' crew and was only occasionally on the same job site with them. Settles testified that he never heard Roberts using slurs. Both Roberts and Nabors deny using racial or Hispanic slurs at work. Nabors admitted to cursing and raising his voice with Dustin, but explained that he behaved in this manner toward other employees as well. Several others employed at Summit, some longtime acquaintances—Tommy Davis, Kenny Norman, Timmy Rodgers, and Nicholas McGinn—all testified that they had never heard Nabors or Roberts using racial slurs.

While working on Roberts' crew, the Ayalas called Nabors with concerns, which Nabors came to the worksite to address the next day. Their primary concern was that Roberts had threatened to dock the Ayalas' pay because he felt that they were not working a full day; the Ayalas also claimed that they raised the issue of Roberts' harassment. Nabors listened to the complaints regarding pay and assured them that they would be paid in full, which they were. The Ayalas claimed that Nabors listened to their complaint about Roberts' harassment but made no response; Nabors claimed that no such complaint was made.

Subsequently, the Ayalas were given the task of filling and loading 80 bags of gravel, a task they had not previously performed as laborers, which the Ayalas asserted was for Nabors' and Roberts' personal use and which Cruz believed to be a punishment for complaining. No others gave testimony on this matter at trial; as such, the purpose and motivation behind this task remain speculative.

Dustin stayed on Roberts' crew for some months, and then told Roberts he wanted to be promoted to driller, with which role came a pay increase of $1.50 per hour, such that he was making $14.00 per hour. Nabors, who was in charge of the blasting crews, allowed the promotion and Dustin became a driller on Nabors' own crew. Nabors believed that Dustin would be better suited to drilling than working as a laborer because Dustin was not a very hard worker and drilling was a less strenuous task. Nabors admitted that he "got into" Dustin for his bad work ethic and attitude, sometimes raising his voice and using "cuss words." Dustin claimed that Nabors treated him poorly and subjected him to racial epithets, and that he was often made to use old or broken tools. Dustin reported this to his father. Cruz called Kenny Norman, Summit's Superintendent, to complain that Nabors was cursing him and Dustin out and wanted to "whip" them in relation to a work dispute, but did not complain about racial harassment. Specifically, Norman understood Cruz's question to be about the implications of fighting Nabors (that is, whether he would be fired), whom Cruz said was intimidating him. Nabors reported to Norman that there had been a problem with Dustin's performance and denied the claim of intimidation.

On the day of his termination, September 25, 2007, Dustin claimed that Nabors asked him to do laborer-type work, and that at some point he asked to take a break, which he was denied while another non-Hispanic employee was allowed to rest. Dustin claimed that when he

suggested that Nabors' treatment was racist, Nabors terminated him, threatening to call immigration on him and using the term "wetback." Nabors denied this account. He said that Dustin was insubordinate and confronted Nabors, saying that he would not do "nigger" work. Timmy Rodgers, another member of the crew who was handling dynamite in the proximity of the confrontation, corroborated Nabors' account. Rodgers testified that Nabors neither used racial slurs nor threatened to call Immigration, but that, instead, Dustin threw a "little fit" when asked to help the laborers with their work, which he referred to as "nigger" work. Dustin admitted that as he left Summit, he smiled at Nabors and told him that if he (Dustin) was fired, Nabors' job would not be far behind.

Subsequently, Dustin called Summit's Chief Financial Officer, Tommy Davis, to complain about Nabors' alleged use of derogatory language and to request that he be rehired. Dustin did not complain about anyone other than Nabors and made no mention of discrimination toward his father. Davis spoke with Nabors, and, ultimately, determined that Nabors was telling the truth—Dustin had not suggested that any other witnesses would support him, and none came forward of their own accord. Accordingly, Davis declined to reinstate him. On October 9, 2007, Dustin filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging race discrimination, national origin discrimination, and retaliation.

Later, but prior to this trial, Dustin paid a visit to David Bournazian, another former Summit employee, at his home. Dustin encouraged Bournazian to testify for the Ayalas in this case. Bournazian, who testified for Summit, claimed that Dustin offered him money in exchange for his testimony; Dustin did not deny that the visit occurred, but he did deny that money was involved. Bournazian testified that he never heard any slurs used toward the Ayalas, or any racist remarks at Summit generally, but that he did witness Dustin getting in trouble with Nabors

for being insubordinate from time to time. Although Bournazian was convicted of serious crimes in his past, including misdemeanor obstruction of justice and felony charges related to firebombs, the Court does not find that this seriously impacted his credibility given that the crimes occurred approximately fifteen years before trial, when Bournazian was still a teenager.

Cruz continued to work at Summit and filed his own EEOC Charge on January 29, 2008, alleging race and national origin discrimination as a continuing action. Cruz, who is illiterate and whose command of spoken English is imperfect, had an individual at the EEOC office fill out the Charge, which Cruz signed. Cruz appears to have understood and intended to include a portion of the Charge that alleged he was "subjected to discriminatory employment practices" (examples of which were included in the Charge), but not to have understood a portion of the complaint that said he was "constantly under the threat of discharge for discriminatory reasons because I have not had any complaints about my ability to do the jobs I am assigned." Indeed, the latter phrase, which appears at the end of the section describing the nature of Cruz's complaint, does not fairly describe the bulk of the treatment described in the Charge.

Cruz was eventually laid off on June 6, 2008, due to a reduction in force. He had been making $13.50 per hour. Later in the summer of 2008, however, Summit was rehiring some laborers, and Roberts sought to rehire Cruz because he had been a good worker. Roberts was "stunned" to learn from Summit's corporate office, however, that he was not allowed to rehire Cruz because Cruz had filed a discrimination complaint. In his testimony, Summit's President, Director of Operations, and Equal Employment Officer, Nicholas McGinn, confirmed that Cruz's EEOC complaint was the reason Cruz could not be hired back—McGinn felt (based on his own investigation, the details of which are murky) that Cruz's complaint against the company was false, and the company would not hire someone who made false statements. McGinn

testified that Cruz would have been hired back but for the fact that McGinn found his EEOC Charge meritless; McGinn made this statement despite assertions elsewhere in his testimony that laborers were not generally being hired during the summer of 2008. Roberts' testimony that he had sought to rehire Cruz, as well as a stipulation between the parties that some laborers were rehired in July and August of 2008, strongly suggest that Cruz's rehire would have occurred but for his filing of the EEOC complaint.

Although there was some conflict in the testimony of Defendant's witnesses as to the precise date of the rehiring in question (part of McGinn's testimony suggested that it did not occur until 2009, despite the parties' stipulation and Roberts' testimony indicating that it occurred in 2008), it is clear that laborers were rehired for a two-and-a-half month project, which the evidence indicated was in 2008. Since the conclusion of that project, Summit has not employed laborers in any of its operations.

At the time of trial, Cruz had not found any employment since leaving Summit over a year-and-a-half earlier, despite seeking a range of jobs (such as construction, retail and Mexican restaurants, among others) in Tennessee and Kentucky, where he had moved. He had a friend read him listings from the paper, and he went to the unemployment office in Murfreesboro to look for job advertisements. He attempted to make use of the computer at the office, but did not know how to use it and at some point ceased to be able to find help with his search there. He only had about eleven unsuccessful job applications (to employers in fields including construction and retail) to show for his efforts at the time of trial, but he was told by a number of other employers he contacted that they were not accepting applications. He had been receiving food stamps and unemployment compensation, having been out of work and forced to rely on government assistance for the first time in his life. He and wife have had financial struggles,

including difficulty paying for his wife's arthritis care and the loss of a car that he pawned after

losing his job at Summit. Further, Cruz claimed that his and his son's experience at Summit

made him feel badly, that he was no good anymore, and that all the doors had been closed on

him at once.

Although Dustin did not find work immediately after leaving Summit, he did find a part-

time position at Burger King as of January 15, 2010, which paid him $7.25 per hour. Dustin

hoped that this position would become full-time work. Dustin testified that his treatment at

Summit made him feel like a lesser person, and he is still angered by the circumstances of his

termination from a good job that he enjoyed.

## II. CONCLUSIONS OF LAW

Plaintiffs allege that Defendant impermissibly discriminated against both Cruz and

Dustin Ayala in violation of Title VII and the THRA for (A) creating a hostile work

environment, and (B) retaliation. Claims under Title VII and the THRA are analyzed identically.

*Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008).

### A. *Hostile Work Environment*

To prove a hostile work environment claim under Title VII or the THRA, Plaintiffs must

establish: (1) they were a members of a protected class; (2) they were subjected to unwelcome

harassment; (3) the harassment was based on Plaintiffs' protected status; (4) the harassment

affected a term, condition, or privilege of employment; (5) the employer is liable. *See Ejikeme v.*

*Violet*, 307 F. App'x 944, 949 (6th Cir. 2009); *Bailey*, 526 F.3d at 885.

Whether alleged harassment affected a term, condition, or privilege of employment

requires the Court to find that the harassment was "sufficiently severe or pervasive to alter the

conditions of employment and create and abusive working environment." *Ejikeme*, 307 F. App'x

at 948 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This determination is "'quintessentially a question of fact.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)). Further, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23). Courts are to employ "common sense" and "appropriate sensitivity to social context" in making this assessment. *Oncale*, 523 U.S. at 82. "To prevail on a hostile work environment claim, a plaintiff must show that his work environment was both objectively and subjectively hostile." *Ejikeme*, 307 F. App'x at 948.

Courts must examine the totality of the circumstances to determine whether or not a hostile work environment exists. *Harris,* 510 U.S. at 23. Factors that may be considered when assessing the circumstances of a potential hostile work environment include: the frequency of the harassing conduct; the severity of the harassing conduct; whether the conduct is physically threatening or humiliating or merely an offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. *Id.*

Defendant denies that any harassment occurred, and also assert an affirmative defense: that Summit may not be held vicariously liable for the conduct of its supervisors because (1) the company exercised reasonable care to prevent or correct racially harassing behavior, and (2) Plaintiffs unreasonably failed to take advantage of the preventive or corrective opportunities made available. (Doc. No. 54 at 9 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998)).)

Because they allege essentially the same facts as the basis of their claim, the Court will address both of the Ayalas' hostile work environment claims together.

     *i.*   *Subjection to Unwelcome Harassment Based on Plaintiffs' Protected Status*

It is not contested that the Ayalas have satisfied the first prong of the hostile work environment analysis, membership in a protected class. Cruz was born in Mexico, and is thus of Mexican national origin and Hispanic race. Dustin, his son, is of Mexican and Hispanic descent. As such, the Court may move on to the second and third prongs of the analysis: whether the Ayalas were subjected to unwelcome harassment on the basis of their protected status.

As the basis for their claims, Plaintiffs cite primarily their allegations that both Nabors and Roberts used racially harassing language toward them on various occasions. (Doc. No. 53 at 29.) Although the Court finds that Cruz heard foul, and possibly racially-charged, language at Summit from time to time, the evidence at trial did not prove that his allegations as to frequent unwelcome harassment based on his protected status were more likely true than not. As to Dustin, the Court did not find his testimony credible as to allegations of harassment.

Not only did Roberts and Nabors deny using such language toward the Ayalas, but a number of others at Summit, including both managers and crew members such as Rodgers and Bournazian, testified that they never heard Roberts and Nabors using slurs. Rodgers corroborated Nabors' testimony about Dustin's bad attitude about working and Nabors' account of Dustin's termination, for which he was present. Nabors testified that he knew Dustin was born in this country, such that he would have no reason to say he would call Immigration on him. The undisputed conduct of Nabors and Roberts toward the Ayalas supports their denials of racially harassing conduct. Nabors hired Dustin at Cruz's urging, and then granted Dustin's request for a promotion and pay raise. Roberts targeted Cruz specifically as a possible re-hire

after the layoff in the summer of 2008, not knowing that Cruz had filed an EEOC Charge against Summit. Although, of course, those affiliated with Summit may have an interest in protecting the company from liability, none of the Defense witnesses were impeached as to their denial that any racial harassment occurred (or denial of awareness that harassing language had been used). Additionally, Plaintiffs' own witness, Settles, a friend, could not substantially support their claims, either: Settles testified that he never worked on Nabors' crew, only heard him use slurs behind the Ayalas' backs, and did not testify that he had heard Roberts using racial slurs.

In addition to convincing denials from the Defense, Plaintiffs' own testimony at trial did not sufficiently support their allegations. Cruz's credibility as to the frequency of the alleged incidents of harassment was somewhat limited by the changes in his story as to how often he heard his supervisors using racial slurs toward him. His testimony varied between alleging that he was subjected to racially hostile language four to six times per week from Nabors to a "couple" or "a few" times total. It was not established that the incident in which Nabors and Roberts had Cruz and Dustin fill bags with gravel had anything to do with their protected status—Cruz's complaints to Nabors were about receiving pay for their work, and the task does not appear to have been far different from any other that laborers might perform at Summit. Indeed, it appears that they did receive the pay they were due, as well.

On the whole, however, it appears likely that foul, and possibly racially offensive or insensitive, language was used in Cruz's presence or behind his back, as Settles testified. It does appear that these incidents were inflated or perhaps simply misunderstood on Cruz's part in terms of their frequency and precise nature. However, Cruz's general demeanor was honest and not evasive, even if his answers to some questions reflected confusion with certain terms and phrases in counsels' questions. Despite some inconsistencies, the main thrust of his grievance

against Summit has remained consistent between the filing of his EEOC Charge (well before he was laid off) and trial. As the Court will explain in the next section, however, the evidence at trial did not indicate that Cruz experienced a hostile work environment at Summit.

Dustin's testimony that he, like his father, was the object of racial epithets, is far more suspect. Beyond not being corroborated, the evidence at trial rendered Dustin's testimony incredible, in particular the statement he made to Nabors suggesting that Nabors would lose his job after firing Dustin and Bournazian's allegations that Dustin attempted to offer him money to testify in the Ayalas' favor. Dustin did not deny making the statement to Nabors or asking Bournazian to testify for the Ayalas, but rather told the Court that he did not intend to threaten Nabors, and that he did not offer money to Bournazian. This, in addition to his testimony about his continued feelings of anger about losing his job and having to struggle financially, seems to fit into a pattern of vengeful conduct toward Nabors and Summit generally that leads the Court to question the honesty of his largely uncorroborated complaints. Ultimately, his testimony cannot be considered credible.

Further, Dustin's allegations that Nabors, in particular, was racist in his treatment of Dustin is undermined by the fact that it was Nabors who allowed Dustin to join Summit, and that it was Nabors who approved his request for a promotion and raise. Although it is clear from the evidence at trial that Nabors took issue with Dustin's performance and may have had words with both of the Ayalas on the job site about breaks and work, Nabors' general conduct toward them and toward Dustin specifically undermines Dustin's already-suspect allegations of harassment.

ii. *Severity and Pervasiveness of Harassment*

Although the Court was only convinced by the evidence at trial that Cruz may have been subjected to some coarse racial language at Summit, it will nonetheless proceed to the next phase

of the hostile work environment analysis as to both of the Ayalas, by which both of their claims must fail. As explained above, to be actionable, harassment must be "sufficiently severe or pervasive to alter the conditions of employment and create and abusive working environment." *Ejikeme*, 307 F. App'x at 948. The establishment of this element requires the Court to perform a factual inquiry, which includes consideration of elements such as the frequency and severity of harassing conduct, whether violence or humiliation were involved, whether the harassment unreasonably interfered with the complaining employee's work performance. *Harris,* 510 U.S. at 23. Further, the workplace must be both objectively and subjectively hostile. *Ejikeme*, 307 F. App'x at 948.

It should be noted that the Court must consider any alleged harassment in the context of the workplace in issue, which, in this case, is a construction site. As stated above, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," and Courts must employ "common sense" and "appropriate sensitivity to social context" in making this assessment. *Oncale*, 523 U.S. at 81-82 (internal quotations omitted). The testimony at trial established that the site was often loud and hot, dangerous substances and heavy equipment were in use (*i.e.*, explosives and drills), and that supervisors such as Nabors raised their voices and cursed when addressing the crews. In such an environment it is to be expected that vulgarities and indelicate expressions might be the norm, and that a reasonable person would not find rough language or behavior to be hostile.

As to Plaintiffs' specific allegations, only Cruz has given the Court reason to believe that Nabors and Roberts engaged in racially charged behavior toward him. As described above, Cruz's testimony was not wholly incredible, but it was inconsistent as to the frequency of any harassment in the form of foul and racially charged language. The Court was not convinced that

Dustin experienced any such harassment.  Further, the one person other than the Ayalas who testified that any racial slurs were used at Summit, Brian Settles, only testified about the language he heard Nabors use, behind the Ayalas' backs; none of the other witnesses called could corroborate the Ayalas' claims that both Nabors and Roberts used frequent racial slurs and profanity.  The evidence at trial suggested that any harassing language that the Ayalas claim to have heard, or that Settles heard, was at most infrequent.

The Ayalas' performance at Summit and attitudes towards their jobs also indicates that their working environment was not hostile.  Cruz performed well at his work throughout his employment at Summit—so well, in fact, that Roberts sought to bring him back to work after layoffs had taken place.  While Dustin was not as hard a worker as his father, his performance and potential were such that Nabors saw fit to promote him to a higher-skilled, higher-paying job as a driller.  Both of the Ayalas testified that they enjoyed working at Summit, and Dustin expressed anger at losing his job.  Because he was making good money, Cruz testified that he did not "fuss" and kept his "ears closed"—apparently, any abuse he faced was at least tolerable.  These facts as to the Ayalas' performance and their general satisfaction with their positions at Summit undercut claims that the working atmosphere was objectively or subjectively hostile.

Although Cruz claimed that Nabors was intimidating him and Dustin, and told Norman that there might be a fight between him and Nabors, it was not established that any threats or tension were related to the alleged racial harassment.  Instead, the evidence at trial showed that tension arose because of work-related issues, particularly in relation to Dustin.  Whether Cruz was actually afraid of Nabors (despite being able to keep his "ears closed") or not, no actual violence is alleged to have occurred.  Although Dustin testified that he thought Nabors was mean, carried a gun, and would "probably try to hurt [him] if [Nabors] could get away with it,"

he did not testify that he was scared of or intimidated by Nabors.  Indeed, Dustin himself admitted to bringing a firearm to work, which he kept in his vehicle and would tend to undermine any subjective concern as to physical threats from Nabors.  (The evidence was inconclusive as to whether Cruz also carried a weapon to the worksite.)  Neither Dustin nor Cruz expressed fear with regard to Roberts.

Plaintiffs did not emphasize in their testimony that the alleged harassment humiliated them at the precise time it occurred (although Dustin mentioned that he felt like "less of a man" because of it), but it should be noted that Plaintiffs' own witness, Settles, claimed that he only heard Nabors use slurs regarding the Ayalas behind their backs.  Dustin did testify, however, that when he and Cruz were made to fill the bags of gravel after complaining to Nabors, the other workers sat in a truck and watched.  While this could have been an instance of humiliation if proved as alleged by Plaintiffs, it was not established by a preponderance of the evidence that this task was intended to punish or single out the Ayalas because of their race, or if it was even outside the scope of their work as laborers.  Nor did Cruz testify that the other workers watched them while they performed this task; this appears to have been an addition or embellishment of Dustin's.  The Court cannot find that the alleged conduct humiliated the Ayalas.

On these facts, the Court must find that any harassing conduct that the Ayalas faced was not sufficiently severe and pervasive to establish that the workplace at Summit was hostile within the meaning of Title VII or the THRA.  As such, Defendants' affirmative defense to the hostile work environment claim need not be addressed.

### B.  Retaliation

Cruz and Dustin Ayala have each brought retaliation claims against Summit under Title VII and the THRA.  Title VII prohibits an employer from discriminating against an employee

who "has *opposed* any practice made an unlawful employment practice by this title . . . , or [who] has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this title. . . ."  42 U.S.C. § 2000e-3(a) (emphasis added).  Dustin claims that Summit unlawfully terminated him for opposing Nabors' allegedly racist behavior under Title VII's "opposition" clause; Cruz alleges under Title VII's "participation" clause that Summit unlawfully refused to rehire him in the summer of 2008 because he had previously filed an EEOC Charge.

When analyzing a retaliation claim based on circumstantial evidence, the Court must follow the *McDonnell Douglas* burden-shifting analysis.  A plaintiff must establish that: "(1) [plaintiff] has engaged in Title VII-protected activity; (2) the employer had knowledge of this fact; (3) [plaintiff] suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action."  *Clay v. United Parcel Serv.*, 501 F.3d 695, 713 (6th Cir. 2007) (citing *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004)).  If Plaintiffs make this showing, the burden then moves to Defendants to put forth a nondiscriminatory reason for the adverse employment action.  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).  To prevail, Plaintiffs must then show that the proffered reason was not the true reason for the adverse action, but was instead pretextual.  *Id.*

Where a plaintiff has produced direct evidence of retaliation, "which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action," there is no need to employ the *McDonnell Douglas* burden-shifting analysis described above.  *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 543-44 (6th Cir. 2008).  In such a case, the plaintiff need not put on evidence regarding the defendant's retaliatory motive or pretext.  *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir. 1991).  Instead, the burden is

on the defendant to "prove by a preponderance of the evidence that it would have made the same [employment] decision . . . absent the impermissible motivation." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 709 (6th Cir. 2008).

Because the Ayalas' retaliation claims are based upon different theories and factual circumstances, and also because Defendant has challenged Cruz's exhaustion of administrative remedies as to his retaliation claim, the Court will address Plaintiffs' claims separately.

### i. Retaliation Claim of Dustin Ayala

The theory behind Dustin's retaliation claim is that Nabors terminated Dustin and kicked him off the construction site, threatening to call Immigration, when Dustin opposed his racist action of refusing to let him take a break while a non-Hispanic worker was allowed to rest. (Doc. No. 53 at 37.)  When Dustin then reported the incident to CFO Davis, Davis did not intervene or investigate, despite the fact that Dustin contacted him about the alleged harassment leading up to his termination.  *Id.*[1]  Based on Plaintiffs' allegations, there are arguably two moments at which unlawful retaliation could have occurred: when Nabors terminated Dustin, and when Davis refused to reverse Nabors' decision to terminate him and instead rehire him. The Court cannot find that Plaintiffs' case was established by a preponderance of the evidence as to the events at either juncture.

As to Nabors' termination of Dustin, it was not proved that Dustin actually engaged in any conduct to oppose Nabors' alleged unlawful actions—the first step of the retaliation analysis.

---

[1] In its proposed findings, Defendant addresses Dustin's firing by Nabors as a discriminatory termination, and Davis' refusal to reverse Nabors' decision as a retaliatory action.  However, as described in the text above, Plaintiffs assert in their filings that both Nabors' and Davis' actions constituted retaliation, and in fact make no mention of discriminatory termination.  The Court addresses the claim as presented by Plaintiff, but should note that, even if Plaintiff were proceeding under a discriminatory termination theory, the Court's findings as to the credibility of Dustin's account of his termination would preclude him from succeeding on such a claim.

The evidence at trial showed that Nabors and Dustin had a dispute over the work Nabors wished him to perform, and that Dustin refused to do what he called "nigger work." The Court was not convinced by Dustin's claim that he confronted Nabors about his alleged racism prior to being fired, in light of Nabors' denial of this account and Rodgers' corroboration of Nabors, as well as the Court's previously-described conclusions regarding Dustin's credibility. It was not shown by a preponderance of the evidence that he opposed any unlawful conduct at this juncture.

Nor was Davis' refusal to reverse Nabors' decision and rehire Dustin a form of unlawful retaliation, as the evidence at trial failed to establish a causal connection between Dustin's complaint to Nabors or Davis and Davis' decision. It is clear that in Dustin's call to Davis, he reported that Nabors subjected him to racial slurs and discriminated against him, and that Davis' decision not to rehire him was made soon after this call. However, "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). The reason for Davis' decision was that he credited Nabors' account of the termination, as does the Court, and was not made aware of any other sources to consult to support Dustin's position. Although his investigation may not have been exhaustive, Davis did make an inquiry with the only other person he was aware of being involved in the incident, Nabors. Plaintiffs did not put forth convincing evidence (or, indeed, any evidence) to indicate that the fact that Dustin allegedly complained to Nabors and then voiced his concern to Davis had a causal connection to the upholding of Nabors' termination decision. There was no evidence put forth to show that Davis' action was retaliatory.

Even if Plaintiffs had proved the four elements of a Title VII retaliation claim, the Court would have to engage in the *McDonnell Douglas* burden-shifting analysis. For essentially the

same reasons as described in the paragraph above, the Court would find that Defendant met its burden of showing that the reason for upholding Nabors' termination of Dustin was non-discriminatory.  Indeed, the reasons for the decision articulated by Davis at trial—that he credited Nabors' account of the termination, that he was provided with no support for Dustin's allegations, and that he knew of no prior complaints about Nabors—were non-discriminatory. Plaintiffs did not put forth evidence proving that this explanation was pretextual, by showing, for example, that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Clay*, 501 F.3d at 704 (internal quotation omitted).  Indeed, Plaintiffs appear to rely on the fact that Davis learned of Dustin's complaints but did not reverse Nabors' decision, which, in itself, does not sufficiently undercut the nondiscriminatory reason Defendant has established.

As such, the Court finds that Dustin's claim of retaliation under the THRA and Title VII must fail.

### ii. Retaliation Claim of Cruz Ayala

Plaintiffs' theory of Cruz's retaliation claim is that Cruz engaged in protected conduct by participating in (*i.e.*, filing) a EEOC Charge on January 29, 2008, because of which Defendant then refused to rehire him in the late summer of 2008 after being laid off in June.  A preliminary matter must be addressed prior to reaching the merits of this claim.

#### a. Exhaustion of Administrative Remedies

The Court must first address Summit's argument that the claim may not be heard in federal court because Cruz failed to exhaust administrative remedies as required by Title VII. (Doc. No. 37 at 2; Doc. No. 54 at 20.)  It should be noted that the following analysis pertains

only to Cruz's retaliation claim under Title VII; Defendant does not argue that there is anything procedurally defective about Cruz's claim under the THRA.

Defendant fully elaborated its argument in a pretrial brief, in which the exhaustion requirement was framed as jurisdictional matter. (Doc. No. 37.) Subsequent to the hearing of this case, however, the Sixth Circuit issued an opinion analyzing the Supreme Court's holding in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006), that "a requirement is jurisdictional only when Congress 'clearly states' that this is the case." *Hill v. Nicholson*, 383 F. App'x 503, 508 (6th Cir. 2010). The Circuit Court had already found, post-*Arbaugh*, that "the Age Discrimination in Employment Act's requirement that a claim be presented in an EEOC charge is *not* jurisdictional," *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 401-02 (6th Cir. 2008), and determined in that *Allen*'s reasoning should be applied to the Title VII context.

Thus, it is no longer a jurisdictional requirement that a claim be presented in an EEOC charge in a Title VII case. *Id.* This does not, however, do away with the requirement that a plaintiff exhaust administrative remedies prior to filing in federal court—Defendant may still argue that the Court should not hear Cruz's retaliation claim because he failed to exhaust these remedies. *Hill* simply allows a court to consider the circumstances of a case to determine whether certain factors (such as waiver by defendant, estoppel, etc.) are present that might allow for the case to proceed in court without actually meeting the exhaustion requirement, rather than the court being required to dismiss for lack of jurisdiction when a plaintiff fails to exhaust. *See Goolsby v. High Caliber Servs., Inc.*, No. 2:10-cv-0040, 2010 WL 4537032, at *3 (M.D. Tenn. Nov. 3, 2010). Here, Plaintiffs have alleged no such factors, but none are necessary in light of the Court's finding that Cruz did adequately exhaust administrative remedies as to his retaliation claim.

Although the exhaustion analysis no longer is a matter of jurisdiction, the Courts sees no reason why principles pertaining to the satisfaction of the exhaustion requirement should not still apply. As Defendant asserts, the exhaustion requirement is not met "unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." (Doc. No. 37 at 3 (quoting *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001).) Defendant argues that the "touchstone of the latter analysis is "whether one could reasonably expect a retaliation investigation by the EEOC to arise from the charge in question." (Doc. No. 47 at 3 (referencing *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).) The Sixth Circuit has recognized, however, that

> . . . it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court. . . . Because retaliation claims, by definition, arise after the filing of the EEOC charge, this rule promotes efficiency by requiring only one filing. . . . Retaliatory conduct occurring prior to the filing of the EEOC complaint is distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint.

*Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546-47 (6th Cir. 1991) (citation omitted). The court expanded on this point in *Abeita v. TransAmerica Mailings, Inc.*, explicitly stating that "[r]etaliation claims are *generally excepted from this filing requirement* because they usually arise after the filing of the EEOC charge. However, this exception to the filing requirement does not apply to retaliation claims based on conduct that occurred before the EEOC charge was filed." 159 F.3d 246, 254 (6th Cir. 1999) (emphasis added) (citation omitted).

Courts within this circuit have followed *Ang* and *Abeita*'s exception for retaliation claims that arise after the filing of an EEOC charge. *See, e.g.*, *Kurtz v. Sec'y of Army*, No. 3:06-1209, 2009 WL 5066901, at *5 n.3 (M.D. Tenn. Dec. 21, 2009) (citing *Abeita* for the principle that

"retaliation claims are exempted from the requirement that claimant explicitly file the claim with the EEOC"); *Ganter v. Potter*, No. 3:08CV-644-S, 2007 WL 1031622, at *5 (W.D. Ky. March 28, 2007) ("Only when the alleged retaliation occurred *prior to* the EEO filing is the plaintiff required to have specifically made a retaliation claim with the EEO prior to bringing suit for the same in federal court. . . . Otherwise, an EEO claim for discrimination is a sufficient predicate."); *Bhama v. Mercy Memorial Hosp. Corp.*, No. 08-11560, 2009 WL 2595543, at *6 (E.D. Mich. Aug. 20, 2009) (because alleged retaliation occurred subsequent to and because of the filing of plaintiff's discrimination charge with the EEOC, court relied on *Ang* in concluding that plaintiff did not need to file another EEOC charge). This Court sees no reason why it should not follow this approach in the instant matter.

*Talbot v. Cuyahoga County Board of Mental Retardation and Developmental Disabilities*, No. 1:07CV2862, 2009 WL 312941 (N.D. Ohio Feb. 6, 2009), another district court case Defendant cites, does not change this Court's conclusion that the retaliation claim is exempted from the exhaustion requirement because it arose after and because of his charge of discrimination with the EEOC. In *Talbot*, the retaliation claim before the court did not arise from the discrimination described in the plaintiff's most recent EEOC charge, which led to her court case and had not included retaliation; rather, the plaintiff alleged in her court complaint (but not in her EEOC charge) that she was being retaliated against because of EEOC charges she had filed years prior. *Id.* at *1-2. Thus, an entirely different scenario from the instant matter was before the court in *Talbot* when it found that that the content of her EEOC charge would not have led to an investigation of possible retaliation, and thus that she had failed to exhaust her administrative remedies, *id.* at 4-5. *Talbot* is not on point with this case or with those cited in the paragraph above.

In light of this analysis, the Court concludes that Cruz's Title VII retaliation claim is properly brought along with his hostile work environment claim. The alleged retaliation arose subsequent to and because of Cruz's EEOC charge claiming that he faced discrimination at Summit, so it is exempted from the exhaustion requirement.

### b. *Establishment of Unlawful Retaliation*

Cruz's retaliation claim is based on Summit President Nicholas McGinn's statements that Cruz, who had been laid off, was not rehired in the summer of 2008 because he filed an EEOC complaint that McGinn believed to be false. (Doc. No. 53 at 35.) Plaintiffs argue that McGinn's mindset is irrelevant, and that Title VII's protection of those who file EEOC charges is broad. *Id*. Defendant does not deny that the EEOC charge was the reason the company decided not to rehire Cruz, whom Summit supervisor Roberts had specifically sought to rehire because he was a good worker. Rather, Defendant asserts that McGinn believed Cruz's allegations to be false, and asks this Court to adopt a "good faith, reasonableness" requirement for a plaintiff's Title VII complaint in order for the plaintiff to be protected from retaliation for participating in the complaint. (Doc. No. 37 at 4-7.) Defendant further argues that Cruz did not suffer an adverse employment action, because, per McGinn's testimony, Summit did not rehire laborers in 2008. (Doc. No. 54 at 19.) The Court will first address Defendant's argument that Cruz's participation in a complaint to the EEOC need not receive protection under Title VII.

### 1. *Appropriateness of Good Faith, Reasonableness Requirement*

Defendant argues that the Sixth Circuit has "left open the possibility that the participation clause may include a good faith reasonable requirement," relying on the Circuit Court's inquiry in *Johnson v. University of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000), into whether the plaintiff had a good-faith basis for his complaint in order to be eligible for the protections of the

participation clause.  (Doc. No. 37 at 5.)  *Johnson* was an appeal of a district court opinion in which the judge had found that the plaintiff lacked a good-faith belief that he was engaging in protected activity as to both his opposition clause claim (for which there is a good-faith requirement) and his participation clause claim.  215 F.3d at 581.   The Circuit Court found that the lower-court judge had "failed to liberally construe Plaintiff's participation clause claim and instead improperly resolved it as an issue of fact; specifically, the district court improperly determined Plaintiff's motive and good faith in filing the charge."  *Id.* at 582.  The Court then went on to explain that the lower court's "conclusion is contrary to our decision in *Booker* [*v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989)] . . . ," citing the following dicta from the latter case:

> The "exceptionally broad protection" of the participation clause extends to persons who have "participated in any manner" in Title VII proceedings. *Protection is not lost if the employee is wrong on the merits of the charge, nor is protection lost if the contents of the charge are malicious and defamatory as well as wrong*.  Thus, once the activity in question is found to be within the scope of the participation clause, the employee is generally protected from retaliation.

*Johnson*, 215 F.3d at 582 (quoting *Booker*, 879 F.2d at 1312 (citations omitted)) (emphasis added).  Thus, while inspecting the district court's analysis of the reasonableness of the plaintiff's belief that he was engaged in protected conduct, the Circuit Court asserted the continuing applicability of language in *Booker* that strongly suggests that a Title VII plaintiff's participatory conduct need not be based in good faith or reasonableness.

The precise meaning of this portion of *Johnson* is perplexing, and courts have not been fully consistent in deciding whether it upholds the rule of *Booker* that the plaintiff's reasonableness is immaterial, or if the Sixth Circuit's review of the district court's reasonableness finding renders this element a requirement to make out a Title VII retaliation

case. Defendant looks to the Seventh Circuit, which, in analyzing various precedents on this matter, including *Johnson*, remarked that the case

> . . . left open the possibility that the participation clause may include a good faith and reasonableness requirement. While *Johnson* stated in dicta that an employee may file a charge that is malicious and still receive participation clause protection, the court still inquired into the good faith basis for the plaintiff's complaint before determining whether the plaintiff was protected under Title VII.

*Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889-90 (7th Cir. 2004) (ultimately following the Seventh Circuit's own precedent, which the court found does require good faith on the part of the Title VII retaliation plaintiff). Defendant also argues that without a good faith or reasonableness requirement, "an employee could immunize his unreasonable and malicious complaint by filing an EEOC charge, and assure himself unlimited tenure." (Doc. No. 37 at 6 (citing *Mattson*, 359 F.3d at 891).) Further, Defendant argues that the Supreme Court's decision in *Clark County School District v. Breeden*, 532 U.S. 268 (2001), which analyzed the Ninth Circuit's application of its reasonableness standard as to a plaintiff's complaints to her supervisor, supports the proposition that charges "without merit or brought in bad faith . . . are not deserving of protection under the participation clause." (Doc. No. 37 at 7.) Finally, Defendant asserts that Cruz's EEOC charge was "as deficient as the plaintiff's harassment claims in *Breeden*," so his retaliation claim must fail. *Id.*

Plaintiff, on the other hand, essentially asserts that *Johnson* stands for the same proposition asserted in *Booker*—that once a plaintiff's activity falls within the participation clause, there is generally protection against retaliation. (Doc. No. 36 at 3.) Plaintiff also argues that Defendant's position would "let the employer determine whether they believe the EEOC charge has merit, and if not, the employer is free to retaliate against the employee," which would eviscerate Title VII's protections against retaliation. *Id.* at 3-4.

As a preliminary matter in assessing the parties' arguments, the Court must reject Defendant's misleading suggestion that Plaintiff's position—and the one that this Court now takes—is contrary to the Supreme Court's decision in *Breeden*. *Breeden*, unlike the instant case (which Defendant fails either to recognize or to bring to the Court's attention), involved Title VII's opposition clause, not its participation clause. As mentioned above, it is clear that a reasonableness requirement does apply to the opposition clause, but not that the requirement applies to the participation clause; courts generally analyze these two issues separately, and there is no reason for the Court to believe that *Breeden*'s handling of an opposition clause claim must be applied to the scenario before it.

Although the Sixth Circuit has not clarified its position in *Johnson* and the circuits appear to be split on this matter, this Court must decline to adopt a new reasonableness or good faith standard in assessing retaliation claims that arise from participation in conduct protected by Title VII. The Court finds that the bulk of the legal precedents before it indicate that this circuit did not adopt a reasonableness standard in *Johnson*, and that unless such a step is definitively taken, the Court must instead continue to apply the *Booker* standard advanced without qualification in *Johnson*.

While the Seventh Circuit in *Mattson* considered *Johnson* to open the door to a good faith and reasonableness requirement, that opinion did not conclude that such was the rule in the Sixth Circuit. Indeed, other circuit courts assessing this issue have understood *Johnson* to mean quite the opposite. The Third Circuit has cited *Johnson* approvingly for the proposition that the validity or reasonableness of allegations in an EEOC charge is immaterial. *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3rd Cir. 2006). In a concurrence, an Eighth Circuit judge listed *Johnson* among cases in which "the broad formulation of the [participation] clause has led some

26

courts to say that it protects even false and malicious allegations, or the filing of frivolous complaints." *Gilooly v. Mo. Dept. of Health and Human Servs.*, 421 F.3d 734, 742 (8th Cir. 2005) (Colloton, J., concurring).

District courts within this circuit appear to have taken differing approaches in addressing the status of the reasonableness requirement post-*Johnson*. In explaining the protections of Title VII, some courts have continued to cite *Booker* and *Johnson* for the proposition that the participation clause offers *all* claimants "exceptionally broad protections." *See, e.g.*, *McDonald v. NYK Logistics (Americas), Inc.*, No. 09-cv-02264-STA-dkv, 2011 WL 197578, at *12 (W.D. Tenn. January 19, 2011); *Roberts v. Principi*, No. 2:02-CV-166, 2006 WL 1696726, at *7 (E.D. Tenn. June 16, 2006). One opinion cites *Johnson* in explaining that "[a] plaintiff may satisfy the participation element of a prima facie case for retaliation by showing *he reasonably believed his activity was protected*," but also cites *Johnson* in claiming that "[t]here is *no good faith or reasonableness requirement* for participation clause conduct, such as filing an EEOC charge." *Alexander v. Ohio State Univ. Coll. of Soc. Work*, 697 F.Supp.2d 831, 849, 50 (S.D. Ohio 2010) (citing *Johnson*, 215 F.3d at 851-52) (emphasis added). A judge from the same district, however, wrote that "while *Johnson may* stand for the proposition that a plaintiff must demonstrate a *good faith* basis to complain about discrimination, it does not stand for the proposition that a plaintiff may introduce otherwise inadmissible evidence to demonstrate a good faith basis." *Barrow v. Terminix Int'l Co., L.P.* No. 3:07-cv-324, 2009 WL 3698477, at *2 (S.D. Ohio Nov. 3 2009) (emphasis added).

From this review, the Court determines that it would be inappropriate to now adopt the reasonable good faith standard Defendant urges; at most, it appears that there is uncertainty as to whether such a standard is to become the rule of this circuit, and, instead, there is a case to be

made that *Johnson* gave new life to the principles of *Booker*. Instead, the rule remains that the participation of a plaintiff, as here, in an EEOC complaint will afford him the exceptionally broad protections of Title VII.

It should be noted, however, that even if reasonableness or good faith were required, the Court would come to the same conclusion that plaintiff's activity is protected. Although Summit's President, McGinn, decided that Cruz's allegations in his EEOC complaint were "false" and "not brought in good faith" (Doc. No. 54 at 19-20), it is not McGinn's personal opinion of the charge that controls under the test Defendant proposes. The evidence before the Court indicates that Cruz, who is an illiterate non-native English speaker, had someone else fill out the EEOC charge at the office where he filed it. Cruz expressed confusion at and contradicted some, but not all, of its precise contents at trial (likely because of the language barrier and the fact that he himself did not pen the allegations) and perhaps overstated his concerns or incorrectly inferred reasons for his treatment at Summit. But Defendant has not drawn the Court's attention to facts presented in this case that would require a finding of unreasonable falsity or bad faith, and the Court sees no basis for such a determination. This is particularly so in light of the fact that the Court has found that Cruz heard some foul language with respect to his race while at Summit, even if it did not amount to a hostile work environment.

### 2. *Proof of Unlawful Retaliation*

The Court finds that direct evidence was presented in this case that Cruz was not rehired because he filed an EEOC complaint, such that the burden shifts to Defendant to prove that he would not have been rehired absent its retaliatory motive.

"Direct evidence 'requires the conclusion that unlawful retaliation was a motivating factor in the employer's action.'" *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 491 (6th

Cir. 2010) (quoting *Abbot v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)). The evidence on which this determination rests is McGinn's testimony that he decided not to rehire Cruz because he filed an EEOC Charge that McGinn deemed false, and that if he had found otherwise, Cruz would have been rehired. As explained above, McGinn's subjective determination about the validity of Cruz's claim is irrelevant, and the law protects participation in conduct such as the filing of a complaint with the EEOC, even when the employee's participatory action may have been unreasonable or not in good faith (although neither was established here). The law described above does not allow an employer to divorce the filing of the claim from its substance in order to escape a finding of unlawful motivation.

Although Summit has tried to insert McGinn's personal assessment of the claim as a step in the inferential chain in this case, the decision not to rehire Cruz was clearly because of the filing of the EEOC charge—McGinn cannot claim that the decision "had nothing to do with the EEOC Charge itself" when it was the Charge that resulted in the decision not to rehire Cruz. McGinn specifically testified that had if he had found the charge to be truthful, Cruz would have been hired back (even though at another point in his testimony, he claimed that no laborers were hired in 2008, contrary to the parties' stipulation on this point and Roberts' testimony about seeking to rehire Cruz).

Defendant put forth no evidence that would tend to show that Cruz would not have been rehired absent Summit's impermissible motive. Indeed, the company's case on this point rests on McGinn's testimony that he found the Charge to be false. Rather than showing that Cruz would not have been rehired absent Summit's impermissible motive, McGinn's testimony clearly reflected that but for the EEOC Charge and its allegedly false contents, Cruz would have been rehired. Further, the stipulation of the parties indicates that the company did indeed hire some

29

laborers in the late summer of 2008, consistent with Roberts' testimony that he sought to rehire Cruz but was told not to try to contact him because Cruz had filed a Charge of Discrimination.

As such, the Court finds that Summit retaliated against Cruz for participating in protected conduct—filing an EEOC Charge—in violation of Title VII and the THRA.

## C. Damages

Only Cruz's retaliation claim was successfully proved at trial, and thus damages only need to be considered as to him. Damages are available under both Title VII and the THRA, and Cruz is seeking back pay, front pay, compensatory damages, punitive damages, and attorney fees and costs. Despite generally being interpreted in the same fashion, Title VII and the THRA differ importantly in that punitive damages are not available under the THRA. *See Carver v. Citizen Utils. Co.*, 954 S.W.2d 34 (Tenn. 1997). The total amount of compensatory and punitive damages awarded under Title VII in this case may not exceed $100,000.00. 42 U.S.C. § 1981a. A plaintiff who is successful on state and federal claims based on the same conduct is not entitled to a double recovery. *See Braley v. City of Pontiac*, 906 F.2d 220, 224 (6th Cir. 1990).

### i. Back Pay and Front Pay

When an employer is found to have intentionally engaged in an unlawful employment practice, the Court may order reinstatement of the employee, with or without back pay. 42 U.S.C. § 2000e-5(g)(1). The Sixth Circuit considers back pay "a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1171 (6th Cir. 1996). "[G]iven a finding of unlawful discrimination under Title VII, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination

throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).

A claimant must mitigate his damages. *See* 42 U.S.C. § 2000e-5(g)(1). If a plaintiff has established discrimination and puts on evidence on the issue of damages, "the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant." *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983). The burden is satisfied when the defendant establishes that "1) there were substantially equivalent positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions." *Id.* at 624. A "substantially equivalent" position is one that has "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status" to the position plaintiff was discriminatorily prevented from filling. *Id.* As to "reasonable diligence," the *Rasimas* court explained that "[a] claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous, and does not require him to be successful in mitigation." *Id.* Further, the reasonableness the claimant's efforts "should be evaluated in light of the individual characteristics of the claimant and the job market." *Id.*

In this case, Cruz is entitled to back pay to make him whole for Summit's unlawful retaliation, because of which he was not returned to work on the two-and-a-half month project for which Roberts sought to rehire him. Although Summit put forth evidence in an attempt to establish that Cruz failed to mitigate his damages, the Court finds that the company did not meet its burden of establishing that substantially equivalent positions were available to Cruz and that he failed to use reasonable care and diligence in seeking those positions. Summit's argument on the issue of mitigation emphasizes Cruz's "at most, half-hearted" efforts to obtain employment

31

after being laid off, but makes no mention of the availability of suitably equivalent jobs. (Doc. No. 54 at 28.) The evidence at trial instead focused on issues such as Cruz's failure to apply to jobs as a janitor or garbage collector—jobs that the Court cannot surmise were substantially equivalent to the laborer position at Summit without having been presented with evidence on the subject. There was no evidence presented that any of the places where Cruz applied for jobs in the construction industry or similar fields were actually hiring people of his skill level. Indeed, he was not hired, and he testified generally that many places were not taking applications at all.

Further, the Court does not find that Defendant has established that Cruz failed to use reasonable diligence in seeking work. Although his job search perhaps could have been wider, the evidence at trial was that he had others assist him in finding job announcements in the newspaper and that he sought help at the unemployment office; that he actually applied to jobs in a variety of fields; and that he was told by a number of other employers that they were not taking job applications. The Court must consider Cruz's particular characteristics—such as his illiteracy and low job-skill level—as well as the nature of the job market in the period after Cruz was laid off and not rehired. Indeed, the economy was difficult enough in 2008 that, as McGinn testified, Summit was forced to conduct layoffs after the company lost a significant amount of business. The refusal of some employers to even take job applications from Cruz is also indicative of the weakness of the job market after he was laid off. In light of Cruz's efforts and these additional factors, Cruz's efforts to find work may not be found unreasonable.

The Court notes that it will not give any weight to Defendant's assertion that Cruz was convicted of a misdemeanor weapons offense that was not disclosed on his job applications, and that these same applications contained releases for background checks, creating an alternative reason for his unemployability. (Doc. No. 54 at 29.) The charge in question was in fact retired

(Def. Ex. 19.), and no evidence was presented on which the Court could conclude that the non-disclosure of the charge had anything to do with Cruz's inability to find work.

The Court will, however, limit the term of Cruz's back pay to two-and-a-half months. It is undisputed that Summit has not employed any laborers in any of the company's operations since the two-and-a-half month project for which Roberts sought to rehire Cruz. There was no indication at trial that Cruz was qualified for any position other than that of laborer at Summit. If a person in Cruz's position at Summit would not have been employed by the company at a particular time, Summit may be relieved of its back pay obligation. *See, e.g.*, *Seep v. Commercial Motor Freight, Inc.*, 575 F. Supp. 1097, 1110 (S.D. Ohio 1983). It would distort the goal of making Cruz "whole" to provide him back pay for a job he could not possibly have held for longer than the two-and-a-half month project for which he might have been rehired.

For the same reason, the Court will decline to award front pay in this case, because Cruz's employment at Summit indisputably would not have continued after the project. In *Madden v. Chattanooga City Wide Service Department*, the Sixth Circuit explained that the following factors should be considered regarding an award of front pay:

> (1) the employee's future in the position from which he was terminated; (2) his work and life expectancy; (3) his obligation to mitigate damages; (4) the availability of comparable employment opportunities and the time reasonably required to find substitute employment; (5) the discount tables to determine the present value of future damages; and (6) other factors that are pertinent in prospective damage awards.

549 F.3d 666, 679 (6th Cir. 2008) (quoting *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1233 (6th Cir. 1996)). In this instance, the first factor of the front pay analysis indicates that an award would not be appropriate—Cruz did not have a future in the position for which he was not rehired. Nor is this a case in which the evidence indicated that Cruz might have been

employed elsewhere in the company, as Summit no longer employs any laborers in its operations at all.

In light of these considerations, the Court finds that Cruz is entitled to back pay for a period of two-and-a-half months, or ten weeks, at the weekly rate the parties both asserted Cruz was earning at the time of his termination, $711.32 (Pl. Ex. 5, Doc. No. 27 at 28). Cruz is therefore awarded back pay in the amount of **$7,113.20**.

  *ii.*  *Compensatory Damages*

Compensatory damages may be awarded for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a. Much of Plaintiffs' argument in their proposed findings that Cruz is entitled to compensatory damages focused on emotional injuries, embarrassment, and humiliation that that Ayalas allegedly experienced due to the hostile environment at Summit. (Doc. No. 53 at 38-39.) Cruz did not testify that the decision not to rehire him because of his EEOC complaint specifically was a source of emotional anguish. He did, however, testify that he feels as though all the doors have closed on him because of his treatment at Summit, and that he has experienced distress from having to rely on government assistance and from the hardship of trying to take care of his wife's health problems. (Plaintiffs did not put on evidence quantifying the latter financial losses.)

A plaintiff must prove that the defendant's unlawful actions caused his emotional distress in order to be eligible for compensatory damages, a burden that may be met by "the plaintiff's own testimony, along with the circumstances of [the] case." *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996). Cruz's testimony as to the effects of being unemployed and unable to find work on his emotional state is pertinent to his eligibility for compensatory

damages in this case, as Summit's failure to rehire him was a cause of his unemployment. His testimony as to embarrassment and humiliation arising from the alleged offensive language and discriminatory treatment at Summit, however, does not have a causal connection with the unlawful retaliation in this case. Only Cruz's emotional anguish and financial hardship related to the decision not to rehire him is relevant.

The Court finds that Cruz is entitled to limited compensatory damages. The evidence at trial showed that Cruz has suffered a significant loss in self-esteem and experienced hopelessness because of his unemployment (indeed, he testified that he felt all the doors had been shut on him), and his employment situation has negatively affected his ability to support himself and his wife. Had Summit not unlawfully retaliated against him for filing the EEOC Charge, he would have been alleviated of such stresses and financial hardship for at least two-and-a-half months.

Plaintiff cites number of cases approving awards of $200,000 and $300,000 for emotional anguish, in each of which the plaintiff was directly exposed to unlawful discrimination or retaliation, about which the plaintiff was personally aware, and then experienced emotional distress. *See Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir. 2008) (upholding jury award of $350,000 for employee who was fired immediately after telling company president that he had filed a complaint with the EEOC regarding age discrimination and subsequently experienced anguish and embarrassment that required him to seek psychiatric help); *Bailey v. USF Holland, Inc.*, 526 F.3d 880 (6th Cir. 2008) (affirming district court's award of $350,000 in compensatory damages per plaintiff for humiliation and mental anguish in case where plaintiffs succeeded on hostile work environment claim regarding repeated use of derogatory racial language); *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469 (6th Cir. 2005) (affirming $250,000 award for emotional distress to employee fired because of his alcoholism, about which his entire

community became aware and caused him depression, anxiety, and insomnia); *Miller v. Alldata Corp.*, 14 F. App'x 457 (6th Cir. 2001) (affirming jury verdict of $300,000 under Michigan law to plaintiff who experienced disparate treatment on the basis of her gender, was ultimately terminated, and experienced emotional distress as a result).

Much smaller compensatory awards have also been approved for plaintiffs who have experienced unlawful retaliation. *See, e.g.*, *Hall v. City of Clarksville*, 276 F. App'x 457 (6th Cir. 2008) (upholding jury award $50,000 on successful retaliation claim, basis of which was harassment following the filing of plaintiff's EEOC complaint); *Hollimon v. Shelby Cnty. Gov't*, No. 03-02919 D/P, 2008 WL 901490 (W.D. Tenn. March 31, 2008), *aff'd*, 325 F. App'x 406 (6th Cir. 2009) (awarding $35,000 in compensatory damages to successful plaintiff who established that she was subjected to disparate treatment on basis of race and gender and then supervised and disciplined excessively as a result of a grievance she filed); *Speers v. Univ. of Akron*, 196 F.Supp.2d 551 (N.D. Ohio 2002) (denying motion for a new trial in case where defendant contested award of $85,000 for violation of plaintiff's First Amendment rights, but did not contest award of $7,000 for retaliation in violation of Title VII).

The Court finds that an award for Cruz's mental anguish and financial hardship should be in keeping with these lower awards, in light of the fact that the retaliatory decision not to rehire him was only one cause of his unemployment, and that Cruz did not establish the severe hardship and embarrassment present in cases where plaintiffs have been awarded hundreds of thousands of dollars. The Court awards Cruz **$20,000.00** to compensate for his mental suffering and financial hardship.

### iii.    Punitive Damages

As explained above, punitive damages are available under Title VII, but not under the THRA.  Under Title VII, punitive damages may be awarded only "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  Plaintiff argues that Cruz's punitive damage claim is "overwhelming" because McGinn, as the company's President and EEO officer, knew that retaliation was not allowed and exhibited reckless indifference to the law when he refused to call Cruz to work.  (Doc. No. 53 at 41.)

The Court disagrees, and will not award punitive damages in this case.  There was no showing that McGinn behaved with malice toward Cruz (indeed, Plaintiffs' argument does not emphasize this element of the standard cited above), and the Court cannot find that the decision not to rehire Cruz was made with reckless indifference, either.  "Punitive damages liability does not arise where 'the employer may simply be unaware of the relevant federal prohibition,' [or] believes the discrimination is lawful . . . ."  *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)).  The evidence in this case showed that McGinn believed that his refusal to rehire Cruz was lawful because he thought Cruz's EEOC Charge was false.  His counsel was clearly of the same opinion, as the analysis undertaken in Part II.B.ii.b.1, *supra*, indicates.  The Court finds that this view is incorrect, but the law of this Circuit on this precise point has not been entirely clear.  While Summit's conduct was illegal, McGinn's actions may be considered no more than negligent on the facts presented.  As such, punitive damages may not be awarded.

iv.     *Attorney Fees and Costs*

Plaintiffs may move for attorney fees and costs following the entry of judgment.  *See*
Fed. R. Civ. P. 54; L.R. 54.01.

## III.  CONCLUSION

For the reasons stated above, the Court **ENTERS JUDGMENT** in favor of Summit on
both of the Ayalas' hostile work environment claims and on Dustin Ayala's retaliation.  The
Court finds that Plaintiffs have met their burden as to Cruz Ayala's retaliation claim, and so
**ENTERS JUDGMENT** in Plaintiffs' favor on this claim, in the amount of **$27,113.20**.

It is so ORDERED.

Entered this the _____25th_____ day of April, 2011.


_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT